FALL 1809,
First District.

DEBORA vs. COFFIN & WIFE.

The right of a Spaniard to sue a Frenchman here whose property was confiscated in Spain.

THIS was an action beginning by an order of seizure, obtained from the Judge of the City Court of New-Orleans, against five negroes belonging to the defendants, and founded on a mortgage specially of five other negroes, (one excepted) than those embraced by the seizure, and generally of all the estate of the defendants, executed by them in the year 1808, at the Havana, where they then resided, for the payment of $ 1400, at the expiration of twelve months thereafter. The material facts set forth by the defendants' plea and afterwards admitted by the plaintiff, were as follows: the money was lent to be employed in a flourishing manufactory of earthenware belonging to the defendants, in the vicinity of the Havana, and was so employed. Before the expiration of the twelve months, the defendants were banished from Cuba, and all their property (excepting the negroes in question, who followed their master) had without any fault of theirs, been seized and confiscated under a general act of confiscation and banishment against all Frenchmen residents in the island; *by which act* of confiscation, &c. the *proceeds of their estates* were held by the government, subject in the *first place* to the *payment of their respective* SPANISH *creditors*. The property of the defendants, *so seized and confiscated* was much *more than sufficient* for the *payment of all their debts*. The confiscation act points out

the mode in which the Spanish creditors may apply for and obtain payment.

The *plaintiff* is a *Spaniard*, resident at the Havana, where the property of the defendants so seized and confiscated lies, *and might have obtained payment* out of the proceeds of the defendants' property in the hands of the government.

Upon this case judgment had been given for the plaintiff in the Court below, from which the cause came up by appeal.

*Smith*, for the defendants. The judgment of the Court below ought to be reversed upon three grounds:

1st. Because after the act of confiscation and banishment, neither this form of action nor any other could be sustained against the defendants in a court of justice in Cuba;

2d. Because it is substantially giving effect to the *penal laws* of a foreign government;

3d. Because as the *proceeds of the defendants' property* seized by the Spanish government are *sufficient* for *the payment of this debt*, and are *accessible to the plaintiff*, and *not* to defendants---that judgment is contrary to equity and moral justice---and therefore not to be sustained in this court of equity as well as law.

I. It ought to be reversed, because after the act of confiscation and banishment, neither this form of action, nor any other, could be sustained against the defendants in Cuba.

F

FALL 1809,
First District.

DEBORA
*vs.*
COFFIN & WIFE.

By the act of confiscation the defendants were reduced to an actual insolvency.---By that act, the title to all their property in Cuba was divested out of them and vested in the government.---In Cuba, the parties to the contract, the *security* for its fulfilment and the *mode of proceeding* to obtain it were by that act all equally changed. If a remedy against the defendants could have been pursued by the plaintiff in Cuba, it must have been by an action, either *in rem* or *in personam.*--- But the plaintiff could not have supported "an order of seizure," or any other process, in the ordinary form, against the property of the defendants, in any of the judicial tribunals of the country, because, by the act of confiscation, &c.--- there the supreme law of the land, all the property of the defendants vested *ipso facto* in the government. And by that act it was ordained that *Spanish* creditors of whatever degree should prove their debts and solicit payment only in conformity to the mode therein pointed out. It would therefore have been as unnecessary and indecorous as inadmissible to have instituted an action in Cuba against the property of the defendants.--- Equally was the plaintiff precluded by that act from any civil proceeding *in personam* against the defendants there. The government had jealously reserved to itself the exclusive privilege of pursuing the persons of the defendants, and that by the criminal mode of banishment. The execution of that sentence was wholly incompatible

with the indulgence to any private individual of civil proceedings against the persons of the defendants.

BUT, on the supposition that the defendants would, after the act of confiscation, have been liable to a real or a personal action in a court of justice in Cuba, could they not, in the one case, have pleaded with effect the act of confiscation, and in the other, is it not too revolting to justice and morality to suppose that after the seizure of all their property by the government, without their fault and subject to the payment of their debts, a court of justice would suffer the plaintiff in the first instance to imprison the persons of the defendants, and not compel him to resort to the sufficient fund held out by the government, which was accessible to him and not to them? If these pleas would have been effectual there, shall they not be here? Shall the plaintiff be permitted to pursue remedies here against the defendants, which would have been inadmissible in his own country—the very country where the contract was made, and where the defendants have experienced from the government a rigour they could not elsewhere have been exposed to? So far was the plaintiff from a capability of maintaining an action in Cuba against the defendants, that he could not lawfully even have *received payment* from them of his debt—any payment made to him, after the act of confiscation, would have accrued to the use of the government, he would

44

have been obliged to deposit that money in the public treasury, and must have been content to receive back the amount of his debt, at such time, in such manner, and under such circumstances, as it pleased to prescribe. If the government had pleased to lay a tax on the debt of every Spanish creditor so received from the Spanish treasury, is it possible that any one would maintain that the Spanish creditors could in such case lawfully pursue the unfortunate exiles in foreign countries to compel them to refund the deficiency thereby produced? If the plaintiff could neither sue nor receive payment from the defendants in Cuba, and that by a law of his own country which he was bound to obey---shall he not *à fortiori* be prohibited from suing here?

"The civil law can hinder, or make void the "obligation of a promise, or contract two ways, "or, by such an act as affects the promiser or "contracter immediately. either by such an act "as immediately affects those to whom the pro-"mise or contract relates, and, in the mean time "affects him, only remotely. And, further, where "the act of the civil law affects him immediately "it may be antecedent, or *subsequent to* the pro-"mise or contract." *Rutherf. Inst. N. L. b. 2. ch. 6. § 11. p. 247. ***** "He bound himself by "the social compact to obey the laws: and "this obligation is antecedent to his pro-"mise or contract." *Ibm. 253. ***** "If we "make a promise or contract by which any per-

" son acquires a right, and the civil law takes from
" him the right so acquired, this act of the
" law affects him immediately and directly; but,
" at the same time will remotely and indirectly
" affect us and discharge our obligation." *Ibid.*
254.    The government then, by the act of con-
fiscation, not only actually prohibited any future
payment of their debt by the defendants to the
plaintiff in Cuba, but it had a right so to do.    It
not only prevented the plaintiff from acquiring
the right which he might otherwise have acquired
of  suing the defendants upon their contract in
Cuba, but it exercised that power consistently
with the principles of natural law.  For it is most
evidently just, that when the sovereign power in
the  state takes from an individual, without his
fault, and only to effect a general benefit, the pro-
perty with which he intended to discharge his
debts, it should protect that individual from suits
that might be instituted against him for not so
employing the property of which he is thus de-
prived.    This confiscation of the defendants' pro-
perty, to an amount sufficient for the payment of
all their debts, and subject to such payment, may
be not inaptly considered as the forced payment
of a debt to  a person constituted by law to re-
ceive it for the real creditor, and resembles pay-
ments made to curators, tutors, husbands, recei-
vers of hospitals, &c. payments which would be
valid, even though the money might happen not

FALL 1809,
First District.

DEBORA
*vs.*
COFFIN & WIFE.

to be received, or enjoyed by the real creditor. *Pothier, Traité des Oblig. part.* 3, *ch.* 1, § 3.

"Contracts are to be decided upon and exe-"cuted only according to the laws of the place "of residence of the parties at the time of mak-"ing them, unless another intention appear." *Pothier, Cont. de Société,* § 159, *p.* 133. "Dis-"putes between foreigners or strangers to be de-"cided according to their own laws." 3 *Partid· tit.* 15, *L.* 15.

"The laws of every empire have force and are "obligatory upon all who are within its limits," —"and by the courtesy of nations, whatever laws "are carried into execution in one government, "are considered as having the same effect every "where, provided they do not occasion a preju-"dice to other governments, or those who are "entitled to their protection." 3 *Dall.* 370, *note.*

So far as the act of confiscation has been car-ried into effect upon the property of the defen-dants in Cuba, they must be bound by it—but they are clearly released from all future obedience to a government which has banished them from its protection—with regard therefore to the miserable remnant of property which they have been able to withdraw from the sphere of con-fiscation, they are entitled here to the protection as well of law as of humanity.

BUT how stands it with the plaintiff—a native and resident of Spain? He is to be viewed, as to this question, only as the indefeisible subject

of the laws of his own government. It does not belong to him, a Spaniard, to alledge the invalidity of a Spanish act of confiscation. With regard to him, that act is absolutely obligatory, not only in Spain but elsewhere; not only so far as it is executed, but in whatever it is only *executory*. With regard to his claims, the title to the whole of what was the property of the defendants, is out of them and in the Spanish government. This is not only law, to him, but is equity, since, in the transfer of title effected by the act of confiscation his interests have not been neglected. If then a recovery could be had against the property of the defendants here, for this debt, the action ought to be instituted in the name of the Spanish government, to the benefit of which it would inure.

II. This leads to the second ground on which the judgment of the court below ought to be reversed—viz : because it is substantially giving effect to the penal laws of a foreign government. What is the situation of the plaintiff under the act of confiscation, as to this debt? He is entitled to demand payment out of the proceeds of the defendants' property in the hands of the Spanish government. Instead of so doing, he institutes a suit against the defendants in this country to recover from them payment of the very debt for which the Spanish government would account to him. Whatever surplus may remain in its hands after payment of Spanish creditors is to become a forfeiture to the state. If the plaintiff

FALL 1809,
First District.

DEBORA
vs.
COFFIN & WIFE.

recover in this action he thereby precludes him-self from demanding from the Spanish treasury that amount, and which he would be entitled to receive. Does it not follow irresistibly, that a recovery by the plaintiff in this suit, would inure substantially to the benefit of the Spanish government—if, in-deed, he would not be obliged to account to it immediately as its agent for the money so reco_vered here? Nothing but the glaring impossibility of that government sustaining a suit in its own name to recover the forfeiture of the remainder of the defendants' property now pursued by the plaintiff would prevent such an account being exacted: and shall we suffer that to be done in our courts indirectly, which we would reject with indignation if directly demanded of us?

III. As the fund in the hands of the Spanish government is sufficient for the payment of the de-fendants' debts, and is accessible to the plaintiff, and not to the defendants, the judgment of the court below is contrary to equity, and therefore ought to be reversed in this court of equity as well as law. And in support of this ground we rely on the principles laid down by the Lord Chan-cellor in the case of *Wright* vs. *Nutt*, in which he says among other things—" There is " no doubt in the world, but that according to " the general principles of a court of equity, "where a man who has not actual possession of " his debt (for if he had actual possession, I " should conceive, that it would be payment even

" that might be available in a court of law, but if
" not so at law, it would at least in a court of equi-
" ty be considered as actual payment, and that a
" man was vexed twice for the same demand upon
" some formal difficulty of making the fact of pay-
" ment available at law ;) but has the power of
" paying the debt depending upon his own act,
" whether he will resort to a particular fund or
" not, if instead of making use of that power he
" will pursue the debtor, it would be too much
" for a court of equity to permit to him to sue the
" person and relinquish the exercise of that pow-
" er which he has at the time in his own hands.

" This case is attended with a circumstance
" still more peculiar; which is, that it is totally
" impossible for him to assign over that right to
" the party debtor here, in order for him to make
" it available."     1 *Hen. Black.* 120.

*Rodriguez*, for the plaintiff. The contract be-
tween the parties was absolute, and it was not in
the power of the Spanish government to abrogate
it.—And the defendants were morally bound to
fulfil their engagement. The many political
misfortunes and losses of the defendants could
not mar the plaintiff's title to the payment of a
lawful debt. He was under no legal or moral ob-
ligation to call upon the Spanish government for
payment of a debt not contracted by it—no equi-
table circumstance in favour of the defendants,

G

FALL 1809
First District.

DEBORA
*vs.*
COFFIN & WIFE.

however strong in a question between them and the Spanish government, can take from him his legal vested right.

A debt is created by contract and exists till the contract is performed. The interference of government to exonerate a debtor from the performance of his contract, whether upon or without conditions, or to take from the creditor the protection of the law, does not in strictness destroy the debt, though it may locally the remedy for it. The debt remains, and in a foreign country payment is frequently enforced. *Per C. J. Ellsworth, Hamilton* vs. *Eaton, Martin's notes,* 76.

The passage cited by the defendants' counsel, out of Rutherforth, is certainly not law. It is not true that *the law can make void the obligation of a promise or contract*, though it may, what to a dishonest debtor is the same thing, withhold from the creditor the legal means of enforcing compliance ; it may create a legal impediment, it may destroy the remedy, but the right of the creditor may only be destroyed by his own act, until the debtor fulfils his obligation.—Parties alone can destroy ormodify contracts.

The obligation of contracts is not only founded on moral principles, but that necessity of individual confidence so essential to the well-being of man, and indispensable to the existence of human society. The moral is scarcely distinguishable from the legal obligation, and the collected power of the society immediately follows to enforce it

By the law of nations, contracts between individuals of different nations shall meet with no legal impediments to their execution in time of peace, and shall have the benefit of the constituted authorities of the country where the creditor finds the debtor to enforce their fulfilment.

Legal impediments are temporary and local. War does not extinguish the rights nor dissolve the obligations of individuals of the belligerent nations, it only suspends the right of bringing suit, *during the continuance of the war.*

The statute of limitation affects the remedy, but affects it *locally* ONLY, within the dominions of the power who passed it.

In *Rugley* vs. *Keeler*, 3 *Johnson*, 261, the Superior Court of the state of New-York held that they were not governed by the statute of limitations of another state, in actions or contracts entered into there. The same decision took place, *Lodge* vs. *Phelps*, 1 *Johnson's cases*, 139, and in *Pearsall & al.* vs. *Dwight & al.* 2 *Mass. Reports*, 84. In all those cases the plaintiffs could not have sued in the states in which the contracts were made, but were allowed to recover in another state : because the *legal impediment* which existed in the place where the contract was made was *local.*

THE act of confiscation did not destroy the debt, for, independently of its effect being *local*, it is *temporary.* If it were repealed, whatever might *have been* the consequences of it during its

DEBORA
*vs.*
COFFIN & WIFE.

existence, it cannot be doubted but the *remedy* *would be revived.*

DURING the war of independence, debts due to the enemy were confiscated, and American debtors were compelled to pay what they owed to British individuals into the public treasury. It cannot be doubted that these acts did not destroy the debt; they affected the remedy. A clause in the treaty made by Mr. Jay provided that British creditors should meet with no *lawful impediment* to the recovery of their debts. *Art.* 4, and in the case of *Hamilton* vs. *Eaton*, already cited, the Circuit Court of the United States, presided in by Chief Justice Ellsworth, determined that the confiscation act of North Carolina had not destroyed the debt, but was only *a lawful impediment* to the recovery, essentially temporary, the duration of which, was put an end to, by the repeal of the confiscation act in the treaty.

EATON, before the year 1777, had given his bond for one thousand pounds to Hamilton. In that year the property of British subjects was confiscated by law, and commissioners were appointed to call on all persons suspected to be indebted to British subjects, examine them on oath and enforce payment of the debt into the treasury by committing the debtor. Hamilton having joined the British, the commissioners called on Eaton, and on oath was compelled to declare he owed one thousand pounds to Hamilton and to

FALL 1809,
First District.

DEBORA
*vs.*
COFFIN & WIFE.

pay the money into the treasury, in order to avoid imprisonment. Yet, the debt was held not to be extinguished, and the Circuit Court was unanimous in the opinion that the confiscation law had created nothing but a *local* and *temporary impediment* to the recovery of the debt, without affecting its existence.

WE therefore contend that the Spanish confiscation act is of the same species—and consequently is only *a lawful impediment*; if it be so, its effect is *local* and *temporary*. As to place it is, to give it the utmost extension to allow it to operate throughout the dominions of Spain ; for, it is only the act of the government of the Island of Cuba—as to time, the impediment must cease to have effect, as soon as the act which created it is repealed. As the plaintiff has brought his suit in a country, within which the act of the government of Spain cannot have any effect, he trusts he will be allowed to recover.

*Smith*, in reply. A *lawful impediment* to the recovery of a debt, in the country where it arose, may without discharging the moral obligation of payment, be *universal*. This is a fundamental principle of insolvent laws. The title of assignees of creditors of an insolvent in one country, is recognised throughout the world. A discharge of an insolvent under a law of one country from debts contracted there, is a legal impediment to their future recovery from him, not only in that

country but in every other—and yet his moral obligation to pay his debts, is undiminished. It is far, therefore, from a consequence, that because an impediment to the recovery of a debt in one country is only a legal, and is not, also, a moral one, that it must be merely local in its nature, and should be in-operative in other countries.— That must depend on the nature of the impediment and the principles of justice, or sound policy on which it may be founded. It is the policy of commercial states, and it is for the benefit of commerce, that the impediment to the recovery of anterior debts from a discharged insolvent, should be both permanent and general. And there is a strong analogy between a discharged insolvent, as to a suit that might be instituted against him for the recovery of a former debt—and the defendants, as to the present action, in this respect, that in both instances their estates have passed into the hands of persons indicated by law to protect the interests of creditors.—The act of confiscation has pursued the principles of an insolvent law both as to the mode of classification and payment of *Spanish* creditors, and in precluding the institution of private suits against their debtors who were the objects of it. And the defendants have thereby, *in fact*, been deprived of an ample estate which has vested in the government as a fund, in the first place, for the payment of their *Spanish* creditors. That fund is more than *sufficient* for the purpose—but, there is

*no reversion of* the *surplus* to the former own-
ers.   Do not then the principles of sound policy,
of natural law, of moral justice, all equally re-
quire that this court should in the present case,
adhere to the principles which regulate it in cases
arising under foreign insolvent laws?   Ought it
not to judge the plaintiff by the strict rule of his
own laws? and deny him every remedy that could
not be indulged t o him under the act of confis-
cation? *Potter* vs. *Brown*, 5 *East* 131.   Shall we
not otherwise be aiding the execution of the *pe-
nal* laws of a foreign government?  If,  in the pre-
sent case, the plaintiff should prevail, if the funds
seized by the Spanish government are not to be
allowed to operate the extinction of their Spanish
debts, the defendants would be rendered unneces-
sarily insolvent.  The act in question was not penal
but *beneficial* and *remedial* to the plaintiff.   Can
then the defendants be morally obliged to provide
a further payment for this favored debt at the ex-
pense of their other creditors, and to the beggary
of their offspring?    Will he receive any injustice
by their refusal?   Even if the Spanish govern-
ment had not a right, for their own benefit, to ex-
tinguish the debt due to one of their subjects,
may they not, at least while they preserve the
debt, modify the form and manner, and prescribe
the time of payment, and thereby morally as well
as legally discharge the debtor? Is it not flagrant
iniquity in the plaintiff then, to turn his back up-
on the offered payment of his debt, only to pursue

FALL 1809,
First District.

DEBORA
*vs.*
COFFIN & WIFE.

and harass the exiled defendants, and rob them of the last of the wreck? And has not a court of equity power to repress the iniquity, and compel the party to resort to the sufficient security within his reach, and which, as he cannot assign it to the defendants, cannot otherwise avail them?

One word as to the case of *Hamilton* vs. *Eaton,* decided in the Circuit Court of North Carolina. It seems to have no material feature of resemblance to this. There the British creditor was not a resident of the state that passed the act of confiscation, nor was he subject to its laws, nor had any fund been provided for the payment of his debt. That act was a species of national hostility, which they thought fit, afterwards, and before the institution of that suit, to recall. So far as that act compelled the deposit of the amount of debts due to British subjects into the treasury of the state, it could be viewed only as an act of oppression to their own citizens, not releasing them from their moral obligation to their creditors. It may well, therefore, be said, that the impediment thereby created to the recovery of the debt, was a local and a temporary one, removed by the acknowledgement of the treaty of peace.

*By the Court,* LEWIS, *J. alone.* The plaintiff is a Spaniard, and the defendants are French emigrants from the island of Cuba, forced away by the government.—A proclamation of the Spanish government compelling the French to leave the island, has directed their property to be confiscated and ordered the payment of

Spanish creditors out of its proceeds. It is agreed, that the defendants had property confiscated to more than a sufficient amount to satisfy his Spanish creditors.

It is therefore, considered, that, as the government has by its act pointed out the mode in which the Spanish creditor should be paid, that mode should be first resorted to, before he could pursue the debtor in this country. And this principle is consonant to equity, justice and humanity.

<div align="right">

FALL 1809,
First District.

